(No. 35410.—

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* JOSEPH R. ROTH, Plaintiff in Error.

*Opinion filed March 31, 1960—Rehearing denied May 16, 1960.*

GEORGE M. CRANE, and MYER H. GLADSTONE, both of Chicago, for plaintiff in error.

GRENVILLE BEARDSLEY, Attorney General, of Springfield, and BENJAMIN S. ADAMOWSKI, State's Attorney, of Chicago, (FRED G. LEACH, Assistant Attorney General, and FRANCIS X. RILEY and WILLIAM W. WINTERHOFF, Assistant State's Attorneys, of counsel,) for the People.

Mr. JUSTICE BRISTOW delivered the opinion of the court:

By writ of error this cause is brought here from the Appellate Court for the First District, seeking to reverse a judgment affirming the conviction of defendant in the criminal court of Cook County. He was charged there in an indictment with the crime of conspiracy and after a jury trial finding him guilty and a disposition of post-trial motions, he was sentenced to the Illinois Penitentiary for a term of not less than one nor more than three years.

The weird details of the crime charged are well canvassed in the majority opinion of the Appellate Court, and in most respects the legal questions challenging the validity of the judgment entered below are disposed of properly. We are in agreement however with the Justice who wrote a dissenting opinion holding that because of the serious character of certain trial errors, it is appropriate to accord the defendant a new trial.

We deem it unnecessary to cover the facts contained in the long record and only recount those necessary to explain the errors that we propose to discuss. The record shows an alleged conspiracy on the part of defendant Roth with Sheldon Polakoff and Donald Dubey to attack and beat and otherwise damage Sanford Lerner. By innuendo, there is a suggestion that Lerner was killed by someone—somehow at sometime not described in the record. But the first witness called herein was the father, Abraham Lerner, who testified: "I did have a son named Sanford Lerner. He was 44 years old."

The defendant was asked the question, "Did you ever conspire with Polakoff and Dubey to mistreat Lerner," and the defendant sought to make a sweeping declaration of his moral cleanliness and said that he had never conspired with anyone. This unresponsive answer should have been stricken on motion made by defendant's attorney. Though this motion was never ruled upon, the prosecution proceeded to demonstrate, for purposes of impeachment, that defendant had been involved in a previous conspiracy to damage and injure the same Lerner.

In the connection of previous conspiracies Alvin Stein testified that he had owned a supermarket, and in the process of going out of business he had used Roth as his attorney in 1951; that in October, 1952, the defendant came out to his place of business at Skokie, Illinois, and told him that he had a younger brother who had been grievously assaulted by Sanford Lerner and that he wanted to "get revenge;" and that Roth further said, "I am willing to pay for it, and for money you can get it done. Do you think $800 ought to take care of it;" that Roth went to the trunk of his car and took out $800 in tens and twenties; that Roth gave Stein information about Lerner, his home and business addresses, personal description, habits, etc. Stein also testified that on November 7, 1952,

he went to the bath house at the corner of Central Park and Roosevelt Road and gave the entire $800 to a man, whom he had never seen before, by the name of Brooklyn; that on the morning following the day arranged for the contact, he received a phone call from the defendant who angrily stated, "Is that the beating I get for $800? He walked into the Temple that night with a bandaid on his face, and that's all. He was cracking jokes about it and laughing all over the place," and that witness answered, "I wasn't there, I don't know what happened. I couldn't further the beating or anything." This story was never revealed to anyone during the intervening five years—1952 to 1957. The police records do not disclose the report by Lerner of the supposed attack made upon him in 1952. Stein testified he remembered the date of the occurrence because it was his birthday. Stein denied that he was angry with Roth, but Archie Berstein, a lawyer, testified that he was acquainted with the legal matter handled by Roth for Stein and as a result of what transpired in that connection, Stein, using much profanity, said "I'll get even with him" —meaning Roth. There are so many patent improbabilities in this story that a strain is put upon one's credulity to believe it.

We will now consider the reckless and enterprising conduct of the assistant State's Attorney who tried the case. Ida Jager, a State's witness, was asked a leading question as to whether or not Lerner had a police guard in January, 1957. Objection was made and sustained, but the same question was repeated. He then asked the same witness, "Did you notice anything unusual about Mr. Sanford Lerner?" After objection was overruled, she answered, "He had a threatening note about the 2nd of ——." Objection was sustained and answer stricken. There is no suggestion in the record that Lerner ever received a threatening note from anybody. There are many other improprieties such as these, all designed to damage the defendant.

The assistant State's Attorney in his argument to the jury said, "Now what is the next phase of evidence here after the 27th? We know that Dubey and we know that Polakoff didn't kill Lerner on that date." We will quote from the record the discussion that followed this statement, designating the prosecutor as Mr. X.

"Mr. Crane: Your Honor I object to this.

Mr. X.: We know that they didn't intend to kill him—.

The Court: Just a minute, Mr. X. Strike out the words 'on that date.' The jury will disregard it.

Mr. X. Excuse me. We know that Dubey and Polakoff didn't intend to—

Mr. Crane: Just a minute, Mr. X.

(Whereupon, the following proceedings were had outside the presence and hearing of the jury.)

Mr. Crane: The defendant makes a motion to withdraw a juror and declare a mistrial, in which he personally joins, on the ground that Mr. X has certainly suggested to this jury that Mr. Lerner was killed on another date.

The Court: You just told them that they didn't kill him on this date.

Mr. X: That's right, Judge, and they didn't intend to kill him.

The Court: Read Mr. X's statement.

(The record was read by the reporter.)

The Court: What would you think if you were on a jury when you say they didn't intend to kill him on that date or didn't kill him on that date?

Mr. X.: Or any date. Judge, that's the evidence, because he was asked, 'Did you go out there or did you intend to kill him on that date?'

The Court: I cautioned you a million times, be careful.

Mr. X.: I am careful on this, Judge.

The Court: When you tell them that they didn't kill him on that date you might as well tell them they did on another date.

Mr. X.: I never intended that.

Mr. Gerber: The damage is done. We are asking for a mistrial.

The Court: I will let it go to the jury but I am fearful, if there is a conviction, what the result of a motion for a new trial might be."

The foregoing discussion was out of the presence of the jury. Then, not more than thirty seconds later, the court was called upon to say, "The motion for a mistrial is denied. But I caution you again, Mr. X, that in your over-zealousness to obtain a conviction you might cause a mistrial. Now, be careful." Repeatedly the court was compelled to warn Mr. X of his aggressive and prejudicial trial tactics. The court in each instance was alert and prompt in his rulings. There was never the slightest indecision or delay in his action. The damage had been done, and a court is powerless to erase the prejudice engendered.

We feel that the ends of justice would be well served if the defendant is given a new trial, one during which the prosecutor is not only conscious of the rules but possesses the instinct of fairness, that gives him the desire to respect them. *Reversed and remanded.*